U.S. District Court
Wisconsin Eastern

Jun 18 2024

FILED
Clerk of Court

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH THE FACEBOOK ACCOUNTS<br>https://www.facebook.com/10000195397336 AND<br>https://www.facebook.com/1025012460 THAT IS STORED AT<br>PREMISES CONTROLLED BY META PLATFORMS, INC. | )<br>)<br>)<br>)<br>)<br>) | Case No. 24-M-049 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____Eastern_____ District of _____Wisconsin_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1111 and 1153 (a) | Murder in Indian Country |
| 21 U.S.C. §§ 841(a)(1) | Distribution of a Controlled Substance |

The application is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*R. M. D'Arcy* 06/18/24 at 1537

*Applicant's signature*

Brian D'Arcy, FBI SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
*(specify reliable electronic means).*

Date: 6/18/2024

*Judge's signature*

City and state: Green Bay, Wisconsin

Honorable James R. Sickel, U.S. Magistrate Judge

*Printed name and title*

U.S. District Court
Wisconsin Eastern

Jun 18 2024

FILED
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FACEBOOK ACCOUNTS https://www.facebook.com/100001953973336 AND  https://www.facebook.com/1025012460 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. 24-m-649 **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian D'Arcy, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook accounts that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been employed as such since July 2017. Upon graduation from the FBI Academy in Quantico, Virginia, I was assigned to the Milwaukee Division, Green Bay Resident Agency. Since arriving in Green Bay, I have been assigned to work on various criminal violations, to include fraud, child pornography, armed robberies, drug trafficking, and crimes occurring on Native American reservations. I have experience in conducting criminal investigations involving suspects using electronic communications to orchestrate criminal activity. I have assisted in the execution of search warrants for the purpose of

obtaining documents relating to various criminal activity. As a Special Agent of the FBI, I am authorized to investigate violations of the criminal laws of the United States, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3.      The facts in this affidavit come from other law enforcement officers and witnesses, my personal observations, and my training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe evidence of violations of 18 U.S.C. §§ 1111 and 1153(a) and 21 U.S.C. §§ 841(a)(1) have been committed by the users of the Facebook accounts **https://www.facebook.com/100001953973336** AND **https://www.facebook.com/1025012460**. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.      On October 30, 2023, Menominee Tribal Police Department (METPD) Detective Joshua Lawe was contacted by Menominee Tribal Warden Maniyan Pyawasay. Pyawasay advised Detective Lawe that her department received a call from an individual by the name of Allen Grignon who believed he may have located a human skull while hunting on October 29, 2023. On October 30, 2023, Detective Lawe, METPD Evidence Specialist/Officer Paige Lehman, and Menominee Tribal Wardens accompanied Grignon to an area off County Highway M and Crooked Hill Road on the Menominee Indian Reservation (MIR). While driving to the location, Grignon informed Detective Lawe that he and his family were hunting the day before and chased a deer into the area. Grignon was walking in the woods looking for blood from the deer and came across what he thought to be a human skull. Upon arriving in the area, Grignon informed officers that they had to drive down a trail. From the trail, Detective Lawe and other officers walked into a wooded area approximately 60 to 80 yards

2

from the trail, where Detective Lawe observed a fully intact human skull with teeth containing what appeared to be dental fillings. Detective Lawe documented the location of the skull with the following GPS coordinates: 45.022133, -88.727002. Images depicting the location of the skull are included below.



3



6.     Following the discovery of the skull, a search of the immediate and surrounding area was conducted by the FBI Milwaukee Evidence Response Team, Menominee Tribal Enterprises employees (logging employees), METPD officers, Menominee Tribal wardens, Cadaver K9 handlers, Anthropologist Jordan Karsten, Ph.D., and University of Wisconsin: Oshkosh anthropology students. A total of four searches occurred on October 30, October 31, November 7, and November 9, 2023. These searches included a detailed search and excavation of the immediate area surrounding the skull, as well as searches and excavations of the locations where other skeletal remains were discovered. A concentrated search of the area surrounding the skull was conducted by instructing personnel to search within an arm's length of one another while raking through leaves in order to disturb the ground to help facilitate the discovery of skeletal remains. General line searches were also conducted in areas further out from the location of the skull. During the searches, a number of skeletal remains were located. According to Dr. Karsten, the remains appeared to have been scattered by carnivore

4

scavenging. No clothing, apparel, personal belongings, or other evidentiary items were located. An image of the assembled remains is included below.



7.      Following the recovery of the skeletal remains, the bones were examined by Dr. Karsten at the University of Wisconsin-Oshkosh Forensic Anthropology Laboratory. In his report, Dr. Karsten noted that many of the recovered skeletal elements displayed evidence of carnivore scavenging. Dr. Karsten searched the remains for any signs of trauma and noted that, "No perimortem trauma is observed." Dr. Karsten estimated that the postmortem interval, or the amount of time that has elapsed since an individual's death, was at least 119 days (July 3, 2023). However, he noted in his report that he believed "it is more likely that the postmortem interval is at least 515 days (June 2, 2022).

8.      In an attempt to determine the identity of the remains, teeth from the discovered remains were sent to the Wisconsin State Crime Laboratory for DNA extraction. On January 26, 2024,

the Menominee Tribal Police received a DNA Databank Notification: Investigative Lead Report from the Wisconsin State Crime Laboratory. The report stated that the "evidentiary DNA profile was linked in the Combined DNA Index System (CODIS) on 01/11/2024 to: Dean Ford, Date of Birth (DOB) 04/25/1992. CODIS is a database maintained by the FBI for searching DNA profiles.

9.    Following the notification from the Wisconsin State Crime Laboratory, investigators obtained dental records for Dean Ford from the Wisconsin Department of Corrections. Dr. Karsten and Forensic Dentist Gabriel Legros, D.D.S., then compared these dental records to the teeth located with the human remains. Dr. Legros' report concluded the following: "After comparing the antemortem and postmortem records, it is my opinion to within a reasonable degree of scientific and clinical reliability that Menominee Case #INV202300881 can be positively identified as Dean A. Ford (DOB 04/25/1992)."

10.    Following the identification of Ford, investigators requested any law enforcement reports involving Dean Ford from surrounding counties, as well as state probation files for Ford. According to a Shawano Police Department report, officers responded to a domestic call involving Dean Ford and his girlfriend, Taylor Cordts, at 503 East Green Bay Street in Shawano, on July 7, 2018. The report indicated that Ford had left the residence prior to the arrival of officers. On July 9, 2018, an officer spoke with Ford over the phone about the domestic incident and requested that Ford come to the police department. Ford refused and said that he would get in contact with his probation agent first. According to Wisconsin State Probation files, Ford last contacted his probation agent on July 10, 2018 via text message, stating that he did not hurt his girlfriend and requesting that the warrant be dropped. Based on a review of law enforcement and state probation records that were obtained, it appears that this was the last time Ford had contact with any law enforcement authority. As far as investigators are aware, only one missing person report was made by a cousin of Dean Ford's, Sierra Ford, on April 1, 2019, to the Shawano Police Department. The complaint was taken, but Dean Ford was not entered as a missing person.

6

11.     On February 22, 2024, investigators interviewed the sister of Dean Ford, Hailey Alegria. Hailey said that the last time she saw and spoke with Ford in person was on July 25, 2018. Hailey also stated that she still had Facebook Messenger messages with Ford from July 23, 2018 on her phone. Hailey provided Ford's Facebook profile, which was listed as "Dean Ohh Zayynx (Randy Moss)." The URL for the profile was listed as https://www.facebook.com/WannaGoHome84."

12.     On April 12, 2024, Facebook provided records for the Facebook profile, "Dean Ohh Zayynx," pursuant to a federal search warrant. Based on a limited review of the Facebook records, Ford's last outgoing communication was at approximately 10:30 PM on July 23, 2018. During a review of Facebook Messenger messages sent between Ford and others on July 22, 2018 and July 23, 2018, investigators observed a conversation between Ford and the Facebook profile, "Nate Robinson" **(https://www.facebook.com/1025012460)**. On July 22, 2018, Ford told Robinson that he wanted to find a "ball." In my training and experience, I am aware that a "ball" is a term often used to describe a quantity of illegal drugs. Robinson then told Ford, "The only person ik (*I know*) that can find that is liza." Ford responded, "She couldn't even find it." The conversation then appears to suggest that Ford was with Liza at some point and they were unable to find illegal drugs. At approximately 6:34 PM on July 22, 2018, Robinson told Ford to add Liza on Facebook and provided Ford with the profile name, "Liza Playtigress." "Liza Playtigress" was later identified by investigators as Liza Naumann. The following day, at approximately 8:38 PM (July 23, 2018), Robinson sent the following message to Ford: "Liza said she ain't round wifi but she said lets go nowwwww." Based on the investigation to date, I believe that this message suggests that Ford and Liza Naumann were attempting to meet up and Robinson was telling Ford that Naumann was waiting for him. Two days later, at approximately 9:10 PM on July 25, 2018, Robinson messaged Ford, "Are you alright? I hurd u jumped out of ol girls car."

13.     On May 1, 2024, investigators interviewed Nate Robinson at the Shawano County Jail. Robinson said that the last time he saw Dean was in 2018. Robinson said that he and Dean knew Liza Naumann but did not hang out with her. Robinson described Naumann as a person they could get

7

methamphetamine from. Robinson said that Naumann told him about Ford trying to rob her. Naumann was somewhere in Keshena and Ford attempted to take something and then jumped out of the car and ran into the woods. This was why Robinson asked Ford about jumping out of Naumann's car in his Facebook message ("Are you alright? I hurd u jumped out of ol girls car"). Robinson could not recall if he saw Ford after this incident.

14.     During the review of Facebook Messenger messages sent between Ford and others on July 22, 2018 and July 23, 2018, investigators located a conversation between Ford and the Facebook profile "Liza PlayTigress," or Liza Naumann **(https://www.facebook.com/100001953973336)**. The messages between Naumann and Ford began on July 22, 2018 at approximately 6:51 PM and ended on July 23, 2018. The initial messages between Naumann and Ford suggest that Ford was attempting to purchase some type of illegal drug from Naumann for another individual. Later in the conversation, Ford asked Naumann, "U got any loot, if ya do wanna throw down." In my training and experience, I believe Ford was asking Naumann if she had any money to purchase drugs with Ford.

15.     At approximately 7:31 PM on July 23, 2018, Ford messaged Naumann, "Meet me at the end of rainbow trail." Around 8:27 PM on July 23, 2018, Naumann messaged Ford, "Here where u at." As noted above, this was just prior to the time that Robinson messaged Ford stating, "Liza said she ain't round wifi but she said lets go nowwwww." Around five hours later, at approximately 1:35 AM on July 24, 2018, Naumann sent the following message to Ford: "I'm coming back to u alone If u get this please let me know ur ok plz u got me." At approximately 1:36 AM, Naumann then messaged, "I'm freaking out I pray ur ok." Later in the morning on July 24, 2018, at approximately 6:11 AM, Naumann sent the following message to Ford: "Well I'm grateful that ur ok thanks for letting me know…"

16.     Based on the Facebook messages and the investigation to date, I believe these messages suggest that Naumann met Ford on July 23, 2018, possibly at the end of Rainbow Trail on the Menominee Indian Reservation. Following this, something appears to have happened to Ford to

8

cause Naumann concern ("I'm freaking out I pray ur ok"). As noted previously, Ford's last outgoing Facebook message was sent at approximately 10:30 PM on July 23, 2018.

17.    On May 21, 2024, investigators interviewed Liza Naumann. Naumann confirmed that the Facebook account "Liza Playtigress" belonged to her and that she was with Ford on July 23, 2018. Naumann did not know Ford prior to this and could not recall how she came about meeting Ford. Naumann believed that Ford may have been looking for pills because the girl that Naumann was living with at the time sold pills. On the evening of July 23, 2018, Naumann borrowed her friend's car and drove up to the Menominee Indian Reservation to meet Ford. Naumann recalled meeting Ford in a confusing area with many trails and courts. Naumann gave Ford a couple of pills and could not remember clearly, but believed she was supposed to give Ford a ride from one place to another. While driving with Ford, Naumann felt uneasy about him and decided to drive to Neopit to pick up her friend Bridget Smith AKA "Bubby." After picking up Smith, Naumann, Ford, and Smith went to Captain's Cove, which is located just West of Middle Village. Naumann said that Ford began to act weird when they were at Captain's Cove. Naumann described Ford as acting very paranoid and worrying that his girlfriend was somewhere and that he was going to get beat up. Naumann stated that Ford was high on methamphetamine. She knew this because Ford had a "bubble," or what Naumann described as a pipe used to smoke methamphetamine.

18.    After spending an hour or two at Captain's Cove, they then drove back up to Neopit and cut across the reservation. Naumann described taking a back way that was all woods and logging roads. Naumann was driving, Ford was sitting in the front passenger's seat, and Smith was behind Naumann. While Naumann was driving, she observed Ford reach down and grab his bag out of the corner of her eye. He then opened the door and jumped out of the vehicle. Naumann estimated her speed was around 55 MPH at the time that Ford jumped out of the car. After Ford jumped out of the car, Naumann stopped the vehicle and pulled onto a logging trail. She then grabbed work boots and a

9

flashlight from her car and went looking for Ford for a few hours while Smith stayed in the car. Naumann was unable to find him, so she returned to the car and drove Smith back to Neopit.

19.     When asked about the messages sent to Ford around 1:30 AM on July 24, 2018, Naumann said that she sent the message about coming back alone to see if she could get Ford to respond to her. Naumann was not sure if Smith had triggered Ford's paranoia about his girlfriend or if Ford was possibly seeing things and thought Smith was his girlfriend. Naumann figured that if she phrased the text message that way, she might at least be able to get Ford to answer her. Shortly after the incident, Naumann learned that Ford's girlfriend had come and picked him up. Naumann estimated that she learned this possibly a day or so after the incident. Naumann believed she learned this from an individual by the name of Nate Robinson. Naumann cited this as one of the reasons she did not report Ford jumping out of her car.

20.     On May 28, 2024, investigators met with Naumann to drive the route that she remembered taking with Ford on the evening of July 23, 2018. Naumann told investigators that she took County Road VV East to meet Ford. While driving County Road VV East, Naumann eventually directed investigators to turn North onto Rainbow Road. Naumann then directed investigators to the North dead-end of Running Bear Road and said that she met Ford at this location. This road runs adjacent to Rainbow Trail, where Ford told Naumann to meet him ("Meet me at the end of rainbow trail). In my experience working on the reservation, the roads to the North of County VV East leading to the various lake lots are difficult to navigate, as Naumann mentioned in her interview with investigators.

21.     Naumann then directed investigators to head back to County Highway VV East and to then head North on State Highway 47. Once in Neopit, Naumann told investigators to turn left on 1st Avenue in Neopit and indicated that N3518 was Smith's sister's house, where she picked up Smith on the evening of July 23, 2018. From here, Naumann said that she, Smith, and Ford drove to Captain's Cove, which is just to the West of Middle Village. After leaving Captain's Cove, they drove back up

10

State Highway 47 towards Neopit. Naumann believed that she took County Highway M as a back way to get to Keshena and County Road VV, where Ford was staying.

22.     While driving County Road M, Naumann was instructed to tell investigators to stop at any point where she may have recalled Ford jumping out of the vehicle. Naumann instructed investigators to stop at a logging road about three miles East of Neopit and three miles West of the location where Ford's remains were found off County Road M. When asked about her confidence level regarding the accuracy of this location, Naumann said that she was not confident. Naumann was also unsure of the direction they were traveling on County Road M, however, she did believe that they were traveling on County Road M when Ford jumped out of the vehicle. A Google Earth image of County Road M with the stopping point is included below.



23.     During the review of the route, Naumann provided some additional information regarding the evening of July 23, 2018. Naumann said that Ford started acting weird when they were up in Neopit. When she was inside at Smith's sister's house in Neopit, Ford was out in the car using

methamphetamine. Naumann said that Ford did not make any comments about wanting to die or hurt himself, but was acting worried and as if something was going to happen to him. Naumann described it as bits and pieces of things that Ford would say and not a full-blown conversation between her and Ford. When Ford jumped out of the car and she went looking for him, Naumann said that Smith was freaking out because she may have had warrants at the time. When asked about the message that she sent to Ford on July 24, 2018, at approximately 6:11 AM, ("Well I'm grateful that ur ok thanks for letting me know…'), Naumann said that she likely sent this message because she may have heard from Nate Robinson or someone else that Ford was okay after jumping out of the car.

24.     On June 3, 2024, investigators interviewed Nate Robinson again at the Shawano County Jail. When asked if he recalled telling Naumann that Ford had been picked up by his girlfriend after jumping out of Naumann's car, Robinson said that he did not recall making such a statement. Robinson said that when he sent the messages to Ford over Facebook Messenger asking if Ford was okay, he remembered the "bubble" showing up on the messages, suggesting that the messages were opened. However, he never received a response from Ford. Robinson believed that Naumann told him about the incident over Facebook. Naumann may have been calling him and it may have been the night of the incident. Robinson was not sure which Facebook account he was using at the time and said that he has had a handful of Facebook accounts that were hacked.

25.     Based on the review of Ford's Facebook Messenger messages and the interviews described above, I believe that Dean Ford met with Liza Naumann on the evening of July 23, 2018. The review of Ford's Facebook messages with Robinson and Naumann suggest that Naumann was likely connected to Ford through Robinson via Facebook. After meeting up with Ford, Naumann stated that she drove to Neopit to pick up her friend, Bridget Smith, who has since passed away. Smith, Ford, and Naumann then traveled to Captain's Cove, where they stayed for one to two hours. Following this, Naumann drove back up towards Neopit and described taking a back road which she believed to be County Road M to Keshena. While driving on County Road M, Naumann stated that Ford jumped out

of the vehicle while she was traveling approximately 55 MPH. This narrative of events on the evening of July 23, 2018 appears to have been relayed to Nate Robinson, who stated that he recalled Naumann telling him that Ford tried to take something from her and jumped out of the car, leading him to ask Ford if he was okay on July 25, 2018 ("Are you alright? I hurd u jumped out of ol girls car"). As mentioned previously, Ford's last outgoing communication on Facebook Messenger was at approximately 10:30 PM on July 23, 2018. Additionally, based on interviews, police reports, and state probation files, Ford appears to have last been seen in July 2018.

26.     I believe that obtaining an order such as that described in this search warrant application to receive the information described in Attachments A and B could potentially assist law enforcement in corroborating or disproving Liza Naumann's statement regarding her activity with Dean Ford on July 23, 2018. According to her statement, Naumann was possibly the last person to see Dean Ford alive. Robinson appears to have put Ford in touch with Naumann via Facebook and was one of the last people to interact with Ford over Facebook Messenger. The Facebook messages or call logs between Naumann and Robinson could help investigators to corroborate Naumann's statement about hearing that Ford was okay from Robinson. Naumann and Robinson's Facebook conversations on July 22 and July 23, 2018, as well as those shortly after the incident, could also help to provide context to their statements and possibly refresh their memories, if interviewed again. If Naumann or Robinson discussed the incident involving Ford with other individuals over Facebook Messenger, this could provide some clarity as to the truthfulness of their statements. Additionally, Naumann and Robinson's Facebook messages may provide information to suggest that one or both provided misleading statements to law enforcement. I am requesting records from July 22, 2018 to July 25, 2018 in order to capture any potential conversations that Robinson or Naumann had between themselves or with others on the day of and shortly following the incident with Ford. Additionally, Robinson's reference to Naumann in his conversation with Ford began on July 22, 2018. Robinson asked Ford if

13

he was alright ("Are you alright? I hurd u jumped out of ol girls car") on July 25, 2018, suggesting a conversation or conversations regarding the incident may have occurred between these dates.

27.     I am aware that Dean Ford was a Native American Indian. Federal jurisdiction for an investigation into his death attaches through that status and because the locations described above are within the exterior boundaries of the Menominee Indian Reservation in the Eastern District of Wisconsin.

## BACKGROUND CONCERNING FACEBOOK[1]

28.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.   Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

29.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

30.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

14

sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

31.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

32.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

33.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

15

34.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

35.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

36.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

37.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

38.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

39.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

40.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

16

41. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

42. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

43. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

44. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses

17

from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

46.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

47.     Based on the foregoing, I request that the Court issue the proposed search warrant.

48.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by

18

serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

49.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

<u>**REQUEST FOR SEALING**</u>

50.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Brian D'Arcy
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____6/18/2024_____, 2024.

HON. JAMES R. SICKEL
United States Magistrate Judge
Eastern District of Wisconsin

19

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with the Facebook accounts **https://www.facebook.com/100001953973336** and **https://www.facebook.com/1025012460** that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **July 22, 2018 to July 25, 2018**;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **July 22, 2018 to July 25, 2018**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers;

future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f) All other records and contents of communications and messages made or received by the user from **July 22, 2018 to July 25, 2018**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account from **July 22, 2018 to July 25, 2018**;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

2

(p)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)    Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(r)    All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government **within 14 days** of issuance of this warrant.

3

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1111 and 1153(a) and 21 U.S.C. § 841(a)(1) involving Liza Naumann, Nate Robinson, Dean Ford, and others as yet unknown from **July 22, 2018 to July 25, 2018,** including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)  The disappearance, murder, overdose death, or accidental death of Dean Ford;

(b)  Communications between Nate Robinson, Liza Naumann, and others as yet unknown;

(c)  Actions taken to conceal the death of Dean Ford;

(d)  The sale of illegal drugs to Dean Ford;

(e)  Messages, photographs, videos, memes, status updates, comments, or other postings or communications

(f)  Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(g)  Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(h)  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be

4

conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

      a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

      b.     such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

           1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

           2.     the process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

      I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                          Signature